UNITED STATES DISTRICT COURT
EASTERN DISTICT OF MICHIGAN
SOUTHERN DIVISION

RICHARD R. STEWART,

                                Plaintiff,                   Civil Action No.: 13-cv-10436
                                                             Honorable Terrence G. Berg
                v.                             Magistrate Judge David R. Grand

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

                                Defendant.
_____/

## REPORT AND RECOMMENDATION
## ON CROSS-MOTIONS FOR SUMMARY JUDGMENT [14, 15]

Plaintiff Richard Stewart brings this action pursuant to 42 U.S.C. § 405(g), challenging a final decision of Defendant Commissioner of Social Security ("Commissioner") denying his application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under the Social Security Act (the "Act"). Both parties have filed summary judgment motions [14, 15], which have been referred to this Court for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). [3].

## I.     RECOMMENDATION

For the reasons set forth below, the Court finds that the Administrative Law Judge ("ALJ") did not err in the weight he assigned to the treating physician's opinion, nor in the other areas that Stewart argues were deficient, and that his decision is supported by substantial evidence of record. Accordingly, the Court recommends that the Commissioner's Motion for Summary Judgment [15] be GRANTED, Stewart's motion [14] be DENIED and that, pursuant to sentence four of 42 U.S.C. § 405(g), the Commissioner's decision be AFFIRMED.

II.     **REPORT**

    A.     **Procedural History**

On April 28, 2010, Stewart filed an application for DIB, alleging disability as of February 10, 2010.  (Tr. 138-40).  On June 16, 2010, he filed an application for SSI, alleging the same disability onset date.  (Tr. 141-45).  Both claims were denied initially on September 10, 2010. (Tr. 86-93).  Thereafter, Stewart filed a timely request for an administrative hearing, which was held on April 13, 2011, before ALJ Roy Roulhac.  (Tr. 34-61).  Stewart, represented by attorney Clifford Walkon, testified, as did vocational expert ("VE") Annette Holder.  (*Id.*).  On May 31, 2011, the ALJ found Stewart not disabled.  (Tr. 15-33).  On January 3, 2013, the Appeals Council denied review.  (Tr. 1-6).  Stewart filed for judicial review of the final decision on February 4, 2013.  [1].

    B.     **Background**

        *1.     Disability Reports*

In an undated disability report, Stewart reported that the conditions preventing him from working are a fractured back, pulmonary embolisms and a head injury when he was 10 years old. (Tr. 161).  He reported that he was at the time 5'8" tall and weighed 264 pounds.  He stopped working as a long haul truck driver due to his conditions.  (Tr. 161; 163).  He had completed high school and had one year of college.  (Tr. 162).

Stewart reported taking a number of medications for his conditions, including Coumadin, Metoprolol, Nitroglycerine and Tordall for his heart, as well as Zantac for his stomach and Zoloft for depression.  (Tr. 165).  He reported being treated by a primary physician, as well as behavioral specialists.  (Tr. 166-68).

In an undated report from an interview with a disability representative, it was noted that

Stewart had difficulty talking and answering questions, as well as seeing, using his hands and writing. (Tr. 158). The interviewer noted that Stewart stuttered, was shaky and had trouble signing his name. She also noted that he walked with a cane and "seemed to be in a lot of pain." (*Id.*).

In an undated function report, Stewart reported living alone. (Tr. 182). He reported that his conditions prevent him from driving "for any length of time," and that blood pools in his legs and he has "a broken back." (*Id.*). He tries to keep moving to lessen his back pain. (Tr. 183). He cares for cats in his home, but his granddaughter changes the litter. (Tr. 183). She also helps him with chores including mowing the lawn. (*Id.*). He reported no problems with personal care and that he could prepare simple meals in the microwave, wash dishes and do laundry "every so often." (Tr. 183-84). Stewart reported being able to drive and go out alone and that he shops weekly for groceries. (Tr. 185). He watches a lot of television because he "can't do much else." (Tr. 186). He occasionally goes out to a movie. (*Id.*).

Stewart reported that his conditions interfere with his ability to lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, see, complete tasks, and get along with others. (Tr. 187). He reported being unable to do much due to back pain and that he wears glasses. (*Id.*). He never reads instructions, feels "scatterbrained lately" and does not finish what he starts. (*Id.*). He reported seeing a therapist for anger issues and that if he is not taking his medications he has difficulty getting along with others. (*Id.*). He handles stress "with medication" and "ignore[s]" changes in routine. (Tr. 188). He reported being in therapy for his fears and conditions. (*Id.*). He also reported purchasing a cane for walking and using his father-in-law's hearing aid. (*Id.*).

In an undated disability appeals report, Stewart reported receiving additional treatment for his conditions including epidural injections. (Tr. 175-76). He reported a worsening of his

conditions, including tearing his shoulder getting out of a tub, that he cannot sit, stand or walk for long without severe back pain, and that he wakes up daily with a migraine headache. (Tr. 179). He reported taking the additional medications of aspirin for his embolisms, omeprazole for diverticulitis, sertraline for depression and a suicide attempt, a stool softener for bleeding, and Xanax for anxiety. (Tr. 178). He noted that the Xanax caused him to be sleepy and the sertraline caused loss of libido and lethargy, but otherwise noted no other medication side effects. (*Id.*). In an updated medications list, Stewart also listed taking Abilify for anger and suicidal thoughts. (Tr. 193).

### 2.   *Plaintiff's Testimony*

Stewart testified at the hearing that he was then in significant pain after standing downstairs at the hearing facility. (Tr. 37; 40). He testified that he has been off of work since February 2010 due to a back injury he sustained after a fall on ice. (Tr. 41). He has gained 116 pounds during that time and currently weighs 368 pounds. (Tr. 48). He testified that he did not have the back pain immediately evaluated, and only learned of an injury after suffering a pulmonary embolism later that year. (Tr. 41-42). Although Stewart testified that he did suffer from back pain in the interim, he did not have it evaluated. (*Id.*). Stewart testified that his pain level is typically an eight on a 10-point scale, and that he does not take narcotic pain medication because it was taken from him after a suicide attempt. (Tr. 40). He only takes acetaminophen. (*Id.*). He had recently been prescribed one Vicodin a day by his physician, but testified that Vicodin does not lessen his pain. (Tr. 42; 46). He attempted physical therapy but he did not see any relief and his insurance expired. (Tr. 47). He also has had three to four epidural injections that helped "a little" but were very expensive. (Tr. 42; 53).

He testified that his back pain radiates to his hands and feet, and both tend to tingle and

go numb, resulting in his dropping things occasionally. (Tr. 48-50). In addition, he has a cyst on his left shoulder that makes it difficult to move that arm, and it goes weak on him. (Tr. 49). He also testified that he has mild to moderate hearing loss, but does not currently wear hearing aids because his were damaged and too expensive to replace. (Tr. 53). He understands people by reading their lips in addition to listening to them. (Tr. 53-54).

Stewart testified to also being treated for psychiatric conditions. (Tr. 43). He went to the hospital following a reported suicide attempt. (Tr. 50). The doctors wanted to admit him but he agreed to outpatient treatment instead. (Tr. 50-51). He testified that he has trouble concentrating, but is not sure whether that is the result of his mental condition or his pain. (Tr. 52). He testified that he is depressed and has a hard time doing things around his house. (*Id.*).

Stewart testified that his typical day consists of sitting in a recliner attempting to catch up on sleep he did not get the night before. (Tr. 43-44). He watches television and plays computer games. (Tr. 44-45). He testified that he generally only gets up to use the bathroom or make lunch. (Tr. 44). His granddaughter helps him care for his cats and grocery shop. (*Id.*). He is able to drive approximately 1-2 hours at a time. (*Id.*). He testified that he can lift less than 10 pounds and walk about a block before needing to rest. (Tr. 45). He can stand about 10 minutes and sit for a half an hour before needing to change position. (Tr. 46).

Stewart testified that not only could he not perform his past work as a truck driver, he could not even perform a sedentary job both due to a need to alternate positions (both in consideration of his back pain and his risk of deep vein thrombosis), and an inability to concentrate due to pain. (Tr. 39-40; 42-43).

3.      *Medical Evidence*

a.      *Treating Sources*

The Court has reviewed the entire record, which contains numerous treating notes showing Stewart having been treated by his doctor and at the hospital for varying conditions ranging from a double pulmonary embolism to the removal of a cancerous lesion from his nose. However, because Stewart only takes issue with the ALJ's analysis of the record as it relates to his back pain, mental health and obesity, the Court limits its discussion to those portions of the record.

1.      *Hospital Records*

On February 15, 2010, Stewart presented to the emergency room at the University of Michigan hospital complaining of chest pain following a dental procedure where he had been administered lidocaine with epinephrine. (Tr. 215-17). Upon exam, some left calf tenderness was noted. (Tr. 213). He was transferred to the chest pain clinic for evaluation. (Tr. 216). At that clinic the following day, the doctor noted Stewart's chest pain episode and a second episode that happened again that morning. (Tr. 207). He also noted that Stewart "denies any active musculoskeletal, cutaneous and neurological complaints presently." (*Id.*). Upon exam, Stewart was found to be "markedly overweight." (Tr. 208). "Musculoskeletal and cutaneous examinations were negative for significant abnormalities." (*Id.*). An ECG and a catheter were administered with unremarkable results. (Tr. 208; 201-11). A chest x-ray was taken to rule out a pulmonary embolism, with initially negative results, and Stewart was discharged home. (Tr. 223; 210-211). However, a second reading of the x-ray, along with a pulmonary vent study, revealed a double pulmonary embolism, and on February 17, 2010, Stewart was advised to return to an emergency room immediately. (Tr. 221-22; 205-206). The chest x-ray also noted a

6

"[r]edemonstration of age indetermina[te] compression deformity in the midthoracic vertebral body." (Tr. 221).

Stewart then presented to the Henry Ford Hospital, Wyandotte that same day.  He reported no musculoskeletal concerns or neurological deficits and specifically "[n]o back pain." (Tr. 270).  An exam revealed a normal cervical ROM with no tenderness, normal range of motion in all extremities and no edema, no calf tenderness, and a normal gait.  (*Id.*).  Similarly, an examination by the nurse found that Stewart "denies back pain . . . parasthesias . . . CVA tenderness, extremity weakness" and could "ambulate normally."  (Tr. 272).  She noted no obvious signs of back trauma.  (*Id.*).  Stewart was admitted to the hospital for treatment of his pulmonary embolism.  (Tr. 271).  He was discharged on February 24, 2010, with instructions to be treated for deep vein thrombosis for six months to a year and to follow up with the GI clinic regarding a possible unrelated diverticulitis diagnosis.  (Tr. 275).

Stewart returned to the emergency room on March 16, 2010, complaining of sudden onset chest pain that radiated toward the back.  (Tr. 297).  He reported no musculoskeletal or neurologic complaints.  (Tr. 298).  Examinations of his cervical spine, his back and his extremities were all normal.  (*Id.*).  He was able to ambulate normally.  (Tr. 301).  A chest x-ray and chest CT were both normal.  (Tr. 299; 360-61).  Stewart was admitted to the hospital for two to three days.  (Tr. 306).  During a consultative exam for his chest pain, Stewart revealed that he was under "extreme" stress due to a lack of a job and his wife being out of town to take care of his father-in-law.  (Tr. 305).  He also expressed being depressed about those issues.  (*Id.*).  The doctor assessed that the etiology of Stewart's chest pain was unclear but that it could be anxiety- and depression-related.  (Tr. 306).  He recommended a psychiatric evaluation.  (*Id.*).

Stewart presented to the emergency room again on April 23, 2010, appearing confused

7

and stuttering, after being referred from his psychiatrist whom he visited without an appointment, apparently forgetting he had just been there the week prior. (Tr. 472; 470). Stewart reported that this condition had been ongoing for two weeks, ranging from mild to moderate in severity. (*Id.*). He had reported to his psychiatrist that he had been taking more Xanax and Zoloft that prescribed at the time. (Tr. 470). He reported a recent job loss due to back injury and recent diagnosis of pulmonary embolism and that he was having difficulty transitioning from being the bread-winner to staying at home. (Tr. 472). He complained of a headache and left facial numbness, as well as weakness in his left arm that was due to an "old injury many years ago to left shoulder." (*Id.*). He also reported a history of a spinal fracture, bilateral torn rotator cuffs and chronic knee dislocation. (Tr. 476). He was reported as using a cane. (*Id.*). He was found to be anxious, in mild distress and crying. (Tr. 472). His back and extremities were all normal, with normal range of motion and no edema. (Tr. 473). A CT scan of his head found "[n]o acute intracranial hemorrhage". (Tr. 473; 362). He was stabilized and discharged home. (Tr. 474).

### 2.    *Dr. Badri Gupta*

Stewart first began treating with Dr. Badri Gupta on February 17, 2010, for groin pain following his initial heart catheterization, as well as abdominal pain treated in the hospital as diverticulitis. (Tr. 230). He denied any recent weight changes and reported sleeping "okay." (*Id.*). He was advised to start taking Flagyl, Cipro and Bentyl for his abdominal pain and referred for blood work. (Tr. 233). He returned to Dr. Gupta on February 26, 2010, again complaining of right groin pain subsequent to the catheterization. (Tr. 237). An exam revealed tenderness in Stewart's right lower quadrant and questionable CVA tenderness, although he denied any history of kidney stones. (*Id.*). Dr. Gupta diagnosed the pain as "probably muscular"

8

in nature, administered a Toradol injection and prescribed Darvocet.  (*Id.*).  An abdominal ultrasound was negative.  (Tr. 357-58).

Stewart returned to Dr. Gupta on March 12, 2010, complaining of burning in his chest following smoke inhaled during a house fire in his neighborhood.  (Tr. 503).  He reported having lost two pounds since his last visit with a good appetite and that he was sleeping okay.  (*Id.*).  An exam revealed no edema in his extremities.  (*Id.*).  A chest x-ray taken the same day was negative.  (Tr. 359).  On March 26, 2010, Stewart returned to Dr. Gupta for a follow-up after his second hospital admission due to chest pain.  (Tr. 501-502).  He reported that he had been diagnosed with anxiety episodes and that "he has been somewhat anxious and depressed since he has not been working due to recent pulmonary embolism."  (Tr. 501).  Stewart had gained nine pounds since his last exam, and reported feeling fatigued, anxious and depressed but that he was sleeping "okay."  (*Id.*).  The remainder of "review of systems was unremarkable."  (*Id.*).  He was diagnosed with anxiety and depression, advised to continue Zoloft and Xanax and referred to a psychiatrist.  (*Id.*).

On April 26, 2010, Stewart underwent a bone density scan, which was within normal limits but which also noted that its quality was degraded due to Stewart's large size.  (Tr. 363-64).  On April 29, 2010, x-rays were taken of Stewart's thoracic spine, which revealed "mild dextro-convex thoracolumbar scoliosis of the lower thoracic and upper lumbar spine," "anterio wedging of several midthoracic vertebral bodies specifically at T7 and T8 associated with old compression fracture deformities," and "lateral and anterior marginal osteophytic spurs at the T7-T8 and T8-T9 levels . . . associated with some minimal degenerative arthritic changes."  (Tr. 469).

Stewart returned to Dr. Gupta on May 13, 2010, stating for the first time that he hurt his

lower back on February 10, 2010. (Tr. 460). He reported that a gust of wind blew his truck door when he was trying to close it in an icy parking lot, knocking him to the ground. (*Id.*). He reported that he went to a clinic where he was examined and x-rays were performed, although these do not appear in the record. (*Id.*). Stewart alleged that he suffered a compression fracture as a result, and rated his pain as a 9/10. (*Id.*). He reported that his symptoms were aggravated by sitting, standing, bending, twisting and lifting, and that his pain was not relieved by rest, heat or ice. (*Id.*). He reported that his pain was located in the lumbosacral region, without significant radiation. (*Id.*). He reported occasional numbness in his toes but also in his fingers, and morning stiffness. (*Id.*). He reported not working since his back injury, but that he was caring for his father-in-law who was suffering from end-stage esophageal cancer. (*Id.*). An exam revealed tenderness across the thoracic spine, but no sensory deficit and normal motor function. (Tr. 461). Stewart could heel and toe walk with some difficulty, and had a limited range of motion. (*Id.*). A straight leg raising test was "uncomfortable." (*Id.*). Dr. Gupta's reviews of Stewart's thoracic spine x-ray revealed "wedging of the mid thoracic vertebrae, but no indication of acute fracture." (*Id.*). Dr. Gupta recommended a CT scan. (*Id.*). A CT scan of Stewart's thoracic spine performed on May 21, 2010, revealed "[m]oderate degenerative change in particular in the mid and lower thoracic spine. Mild wedging of T7 and T8 anteriorly." (Tr. 365).

At a follow-up on June 14, 2010, Stewart complained of pain in his thoracolumbar region. (Tr. 367). He reported the pain level at a 10/10, and was experiencing numbness and parasthesias in his fingers. (*Id.*). He further reported that he was advised that he could not go back to work "due to the medications." (*Id.*). An exam revealed tenderness in the cervicothoracic region, but no deformity or percussion pain and no evidence of sensory level.

10

(*Id.*).  Reflexes were moderate and there was no indication of hyperreflexia.  (*Id.*).  Dr. Gupta explained the results of the CT scan and x-rays.  (*Id.*).  Stewart requested to be referred to the pain clinic for "more aggressive measures."  (*Id.*).

Stewart returned to Dr. Gupta on September 16, 2010, complaining of suffering a shoulder injury upon getting out of the tub.  (Tr. 416).  An exam revealed no swelling, but some tenderness over the anterior part of the shoulder.  (*Id.*).  Range of motion was full "with some pain on extreme of movements."  (*Id.*).  An x-ray of Stewart's left shoulder was negative.  (*Id.*; Tr. 380).  Stewart was diagnosed with left shoulder pain, rule out tendinitis, injected with Toradol and referred for an ultrasound.  (*Id.*).  An October 7, 2010 ultrasound of the area revealed no rotator cuff injury, but early osteoarthrosis and subscapular tendinosis. (Tr. 381).

On November 8, 2010, Stewart presented to Dr. Gupta for the purpose of filling out disability forms.  (Tr. 410).  He reported having received little benefit from the back injections performed by the pain clinic.  (*Id.*).  He had gained 9 pounds since his last appointment.  (*Id.*).  He reported fatigue, but that he was sleeping "okay."  (*Id.*).  An exam revealed some tenderness over the mid and lower lumbar spine, but a negative straight leg raising test on both sides.  (*Id.*).  His forms were filled out and he was advised to return in six weeks.  (*Id.*).

On February 9, 2011, Dr. Gupta completed a medical source statement for Stewart, finding that he suffered from chronic lower back pain, depression and anxiety.  (Tr. 522; 525).  He found that Stewart had difficulty walking or standing "too long" and that it was uncomfortable to walk and bend.  (Tr. 525).  He noted that Stewart also "feels depressed."  (*Id.*).  Dr. Gupta found that Stewart could only lift less than ten pounds, could stand and walk a total of 1-2 hours, less than one hour at a time, and could sit for 5-6 hours, for between 2-3 hours at a time.  (Tr. 526).  He found that Stewart did not have significant limitations with reaching,

11

handling or fingering, did not have to take unscheduled rest breaks during the day, and did not have "good days" and "bad days." (*Id.*). Stewart could frequently look up and down, turn his head and hold it in a static position. (Tr. 527). He could rarely climb stairs and never twist, stoop, crouch, squat or climb ladders. (*Id.*). Dr. Gupta found that Stewart's pain was frequently severe enough to interfere with his attention and concentration to work. (*Id.*). His prognosis for Stewart was guarded, and he opined that Stewart could not work "due to chronic low back pain." (Tr. 523).

### 3. Pain Clinic

Stewart presented to the pain clinic on June 30, 2010. (Tr. 375). He reported pain beginning at his tailbone and radiating up his neck to the back of his head and causing a headache. (*Id.*). He also reported radiation down both legs to his toes. (*Id.*). He described the pain as stabbing and reported that it was aggravated by walking and standing (up to a 10/10 in severity) and relieved by sitting (down to a 0-1/10). (*Id.*). His present pain was 7-8/10. He associated his pain with tingling, weight gain, depression and sleep problems. (*Id.*). He reported being able to complete his activities of daily living "unassisted." (*Id.*).

An exam revealed full range of motion in Stewart's neck with pain upon full flexion and extension. (*Id.*). He was able ambulate without an assistive device with a steady gait and heel and toe walk without difficulty or pain. (Tr. 376). A straight leg raising test was negative but a Patrick's sign was positive bilaterally with complaints of increased hip pain. (*Id.*). His strength was full in his left arm and both legs, and 4/5 in his right arm with increased tremor. (*Id.*). He was referred to physical therapy and given a TENS unit. (*Id.*). He was also scheduled for a lumbar steroid injection and an MRI was ordered. (*Id.*).

Stewart began physical therapy on July 19, 2010. (Tr. 441-42). He reported pain of 2-

10/10 located in the lumbar region and radiating to his legs. (Tr. 441). He reported moderate impairment with dressing, driving, prolonged sitting and standing and walking both on level surfaces and stairs. (*Id.*). He reported severe impairment with sleeping and bending and maximum impairment with housework and work "performance/potential." (*Id.*). An exam revealed decreased sensation in his left lower extremity generally and a positive sitting straight leg raising test on the right. (*Id.*). The clinician noted that Stewart had "signs and symptoms consistent with pain associated with lumbar and thoracic spondylosis and thoracic compression fracture." (*Id.*). A treatment plan was developed, and it was noted that Stewart had "fair rehabilitation potential." (Tr. 442).

Stewart underwent an MRI of his thoracic and lumbar spine on July 20, 2010, which revealed:

> 1.   Chronic appearing anterior wedging of the T7 and T8 vertebral bodies. Giving multilevel Schmorl's notes throughout the lower thoracic and upper lumbar spine such wedging may relate to Scheuermann's disease.
>
> 2.   Hypertrophic ligamentum flavum within the upper to mid thoracic spine, which are calcified on correlative. These do not cause any significant spinal cord compression.
>
> 3.   Degenerative changes and disc disease within the thoracic and lumbar spine, as well as within the partially visualized lower cervical spine. Type II degenerative marrow changes at the T8-T9 intervertebral disc space. Mild grade 1 retrolisthesis of L4 relative to S1 secondary to facet arthropathy, with multilevel facet arthropathy within the lower lumbar spine. Posterior disc bulge at L5-S1 and superimposed annular fissure.

(Tr. 440). On July 26, 2010, Stewart underwent his first lumbar epidural steroid injection and epidurogram without complication. (Tr. 438).

On August 23, 2010, Stewart was discharged from physical therapy due to a lack of progress after attending five of seven sessions. (Tr. 431-32). He reported no change in pain and

continued numbness and radiculopathy.  (Tr. 431).  He also reported that while he was performing his home exercises, he was not doing so consistently, and he was not using his cane as often.  (*Id.*).  He was found to have severe impairment with prolonged standing, moderate impairment with driving, sleeping, prolonged sitting and with walking on level and un-level surfaces.  (*Id.*).  He was also noted to now have an increased lumbar range of motion with full range of motion and no pain on flexion, full range and only mild pain on extension, and 75% range and mild pain on side bending.  (*Id.*).  His strength was also increased to 4/5 in his legs with pain and 5/5 in his arms with no mention of pain.  (Tr. 431-32).  His function level was unchanged, however.  (Tr. 432).  The clinician noted that Stewart's compliance with his home exercise program was in question and he was being referred back to his primary physician for further evaluation.  (*Id.*).

Stewart underwent a second lumbar injection and an occipital nerve block with no complications and was recommended to follow up in two weeks for a cervical facet injection. (Tr. 421-26).  The following day he presented to his primary care clinic complaining of a blood stain in his shirt and a mild-to-moderate pain or pressure-like sensation in his lower back, radiating to his knees.  (Tr. 420).  He reported having received "pretty good" pain relief from the procedure the day before.  (*Id.*).  An exam revealed a full range of motion in Stewart's legs and no sensory deficits.  (*Id.*).  He was found to have suffered a muscle spasm and counseled.  (*Id.*).

Stewart underwent radiofrequency thermocoagulation of his right L3, L4 and L5 dorsal primary ramus on September 29, 2010, and of his left side on October 1, 2010.  (Tr. 413-15).  He was recommended to follow up in four weeks, (Tr. 413), but there are no further treatment records from the pain clinic in the file.

4.       *Mental Health Treatment*

On March 26, 2010, Stewart presented for a psychiatric consultation with Dr. Zamari after being referred by his primary physician, Dr. Gupta, following an in-hospital treatment for chest pain.  (Tr. 497).  Stewart reported being "under a lot of stress" since suffering a pulmonary embolism the month before, which resulted in him not being able to work driving a semi-truck, and that now his wife had taken over the driving and was out of state.  (*Id.*).  He reported feeling "like a failure now that he is not working."  (*Id.*).  He reported poor sleep, extreme depression, emotional overeating, no energy and difficulty with long term memory, although the latter he "related to a closed head injury at age 10."  (*Id.*).  He further reported arthritis in his neck, back and knees.  (Tr. 498).  He reported an inability to focus and some suicidal thoughts.  (*Id.*).  He reported having attempted suicide three times in the past.  (Tr. 499).  He was diagnosed with recurrent major depression, moderate, generalized anxiety disorder and simple phobias, and to rule out post-traumatic stress disorder.  (Tr. 500).  The doctor increased his Zoloft dosage and referred him to group and individual therapy.  (*Id.*).

Stewart began group therapy on March 30, 2010.  He presented to the group with a depressed mood and a flat affect.  The therapist noted no concentration problems and Stewart denied any memory problems.  (Tr. 494).  On April 1, 2010, Stewart presented to the group feeling worse and having had suicidal thoughts.  (Tr. 491).  His mental status examination was unchanged from the previous session.  (*Id.*).  That same day, Stewart called the crisis hotline, stating that he was told by Dr. Zamari to go to the emergency room due to suicidal thoughts, but that he changed his mind and is "feeling a little better."  (Tr. 493).  He treated with Dr. Zamari the following day on April 2, 2010.  (Tr. 489-90).  He reported being depressed, not sleeping well and overeating, but that his wife was coming home so he had something to look forward to.

(Tr. 489).  He was no longer suicidal.  (*Id.*).  An exam revealed a depressed mood and affect and reported difficulty with memory and concentration.  (Tr. 489).  Stewart also presented walking with a cane, reportedly due to back pain.  (*Id.*).  His mental diagnoses remained unchanged and his Zoloft dosage was increased.  (Tr. 490).

At a group therapy session on April 6, 2010, Stewart reported feeling unchanged mentally, and that he was "in chronic pain and not sleeping well which adds to his depression." (Tr. 487).  The following day, Dr. Zamari noted that Stewart had informed him that "since yesterday he has been having pain all over his body (joints, muscles, fingers), to the point where he could barely get out of bed.  He was told by a pharmacist that it may be a rare side effect from the Zoloft."  (Tr. 486).  Stewart reported that if the pain is not better by the next day he would stop the Zoloft and Dr. Zamari asked for a follow-up call.  (*Id.*).  The day after that, on April 8, 2010, Dr. Zamari noted that Stewart had encountered him in the hallway and reported that "he realized that the pains all over his body were from arthritis, and were related to changes in the weather, 'low pressure system.'  Therefore he decided to stay on Zoloft 200mg a day and not cut down."  (Tr. 320).  That same day, Stewart presented to group therapy stating that "his arthritis has been bad and he is irritable with very little patience."  (Tr. 483).  Stewart reported yelling at his ill 86-year-old father-in-law for having ruined the carpet, which Stewart then had to remove. (*Id.*).  His mental status remained unchanged from previous sessions.  (*Id.*).  At a subsequent session on April 13, 2010, Stewart reported feeling better and less irritable and that he was sleeping better.  (Tr. 480).  He noted that his wife was home now.  (*Id.*).  His mental status remained unchanged and he was excused from his next group session due to financial constraints.  (*Id.*).

Stewart attended an individual therapy session with his wife and daughter on April 16,

16

2010.  (Tr. 478-79).  Stewart reported a history of abuse and suicidal thoughts.  (Tr. 478).  He reported chronic anxiety and depression.  (*Id.*).  His wife drove a truck and was leaving again soon and the therapist discussed the idea of him going along after he was cleared to travel (due to his need to be present for weekly blood tests for his prior pulmonary embolism).  (*Id.*).  Stewart was well-groomed and cooperative but depressed and anxious.  (*Id.*).  He had no concentration problems and denied memory problems.  (*Id.*).  A course of individual therapy was prescribed and he was excused from group therapy.  (Tr. 479).

Stewart did not treat again with a mental health provider until February 21, 2011, when he presented to the emergency room with depression and stress that had worsened over the past few weeks.  (Tr. 530-36).  He was depressed about his financial situation and recent weight gain (gaining 120 pounds in the past year), and requested help to deal with his depression.  (Tr. 530; 532).  He reported suicidal ideation but no plan.  (Tr. 532).  He reported that he last treated in August 2010 but stopped due to a lack of insurance.  (*Id.*).  A review of systems revealed no reports of back or neck pain and a physical exam of his back and neck was normal with no tenderness.  (Tr. 531-32).  He requested a medication change due to the fact that he reported Zoloft was not working.  (Tr. 533).  He was diagnosed with major depressive disorder and discharged with referral for outpatient mental health treatment.  (Tr. 531).

On February 22, 2011, Stewart underwent a psychosocial assessment with Team Mental Health Services.  (Tr. 548-53).  He reported being depressed and having suicidal thoughts.  (Tr. 548).  He was separated from his wife and felt like a failure to her.  (*Id.*).  He also reported being out of work since suffering a back injury.  (*Id.*).  He also had recently lost his father-in-law.  (*Id.*).  Stewart reported living alone and being able to take care of his daily activities.  (Tr. 548).  He also reported spending a lot of time on the computer.  (Tr. 549).  A mental exam revealed a

17

solemn appearance, intact memory and clear expression of thoughts. (Tr. 548). He was diagnosed with major depressive disorder and issued a GAF score of 60. (Tr. 552). A treatment plan was put in place. (*Id.*). Stewart attended his first session on February 28, 2011, where the course of treatment was outlined and explained. (Tr. 554).

At a psychiatric evaluation on March 7, 2011, Stewart reported having gone to the emergency room overnight after drinking heavily. (Tr. 555). He reported three suicide attempts in the past six months. (*Id.*). An exam revealed anger, irritable behavior, despondent mood and sadness. (Tr. 556). It also revealed normal speech, good eye contact and average intelligence. (*Id.*). Stewart was found to have no suicidal thoughts or plans. (*Id.*). He was diagnosed with major depressive disorder, alcohol and prescription drug abuse and issued a GAF score of 50. (*Id.*). He was prescribed Zoloft and Abilify and instructed to return in four weeks. (*Id.*).

At a therapy session that same day, Stewart reported no suicidal ideations, and presented with normal speech and neat attire. (Tr. 557). His judgment, insight and thought processes were intact. (*Id.*). He engaged with the doctor and therapist and was found to be of no danger to anyone. (*Id.*). A treatment plan developed on March 17, 2011, noted that Stewart reported a limited support system and numerous medical conditions including a cyst on his humorous and a back problem preventing him from working. (Tr. 559). He also reported eating from depression and being depressed because he eats. (*Id.*).

At a March 28, 2011 therapy appointment, Stewart was cooperative and verbal with no suicidal ideations and appropriate affect. (Tr. 570). He engaged with the therapist and doctor and was given a peer support counselor with whom he met. (Tr. 569-70). Stewart reported feeling better after the session. (Tr. 570). At the last therapy session of record, on April 21, 2011, Stewart presented as cooperative and friendly with a depressed mood and congruent affect.

18

(Tr. 572). His insight and judgment were intact and he had no memory impairments. (*Id.*). He discussed an upcoming vacation to Florida, continued difficulty sleeping and poor eating habits. (*Id.*). He reported the session as "helpful." (*Id.*).

### b.   Consultative and Non-Examining Sources

On August 27, 2010, Stewart underwent a consultative psychological exam with Dr. Hugh Bray for the State of Michigan. (Tr. 307-12). At the appointment he was 327 pounds. (Tr. 307). He attended alone, having driven himself. (*Id.*). He reported depression and suicidal thoughts since childhood, but that current financial issues have exacerbated his condition. (Tr. 308). He reported not being able to work due to back problems. (*Id.*). The examiner noted pain behavior and that Stewart used a cane to walk. (Tr. 309). He reported his pain level at an 8/10. (*Id.*). He also reported only getting 1-2 hours of sleep a night due to "pain and worry." (*Id.*). He reported getting along poorly with family and having no friends. (*Id.*). He had no interests. (*Id.*). He reported engaging in daily activities "independently, slowly due to pain or mobility issues," including simple cooking, shopping, check cashing, a history of providing child care, driving, watching television, reading, visiting and running errands, and occasional housekeeping, laundry, walks, and video games. (*Id.*). He reported that the activities he does not perform are due to pain and that his daughter helps him. (*Id.*).

After a mental status exam, Dr. Bray diagnosed Stewart with major depressive disorder, moderate, and issued him a GAF score of 45 with a guarded prognosis. (Tr. 311-12). Dr. Bray opined that Stewart was moderately impaired in his ability to relate to fellow workers and supervisors, mildly impaired in his ability to understand, remember and carry out tasks, moderately impaired in his ability to maintain attention, concentration, persistence, pace and effort, and significantly impaired in his ability to withstand stress and pressure associated with

19

day-to-day work activities. (Tr. 312).

A psychiatric review technique form completed by Dr. Leonard Balunas on September 9, 2010, diagnosed Stewart with an affective disorder, namely depressive syndrome, and found that he had mild limitations in his activities of daily living and social functioning, and moderate limitations in his ability to maintain concentration, persistence and pace. (Tr. 68). A mental residual functional capacity ("RFC") assessment completed by Dr. Balunas found that Stewart's ability to understand, remember and carry out detailed instructions was moderately limited, but that he is able to understand, remember and carry out 1-2 steps instructions and carry out tasks that require "limited need for sustained concentration." (Tr. 71-72).

A physical RFC assessment completed by Dr. B.D. Choi concluded that Stewart could lift 10 pounds frequently and 20 occasionally, stand and/or walk about six hours in an eight-hour day and sit for the same amount of time, push or pull within the aforementioned weight limits, and occasionally climb ladders, ropes, scaffolds and stairs, stoop, kneel, crouch or craw, and frequently balance. (Tr. 69-70). It further found he should avoid concentrated exposure to vibrations, fumes and hazards. (Tr. 71). The RFC concluded that Stewart was capable of light work. (*Id.*).

### 4.    *Vocational Expert's Testimony*

VE Annette Holder testified at the hearing. She classified Stewart's past relevant work as medium and semi-skilled by the Dictionary of Occupational Titles ("DOT") but heavy as actually performed by him. (Tr. 55). She was then presented with a hypothetical claimant of Stewart's age, education, and vocational background who

> could perform work at the sedentary level, lifting and carrying up to 10 pounds. This hypothetical individual can walk, or stand and walk, for two hours, and could sit for six hours in an eight-hour day. This hypothetical individual will need a sit stand option at will, and . . . pulling and pushing

20

> at less than 10 pounds.  This hypothetical individual could occasionally climb ramps and steps, balance, step, stoop, kneel, crouch and crawl. Should avoid unprotected heights, vibrating too[ls], and heavy machinery, uses a cane for ambulation and balance.  And be limited to performing unskilled work, limited to one or two tasks, with [ ] skill level not exceeding 2.

(Tr. 55-56).  The VE was then asked what jobs in the national economy such an individual could perform.  (*Id.*).  She testified that the hypothetical individual could perform the occupations of sorter (1,200 jobs in the region), packer (1,100 jobs) and information clerk (1,300) jobs.  (Tr. 56).  The ALJ then modified the hypothetical to include a limitation for a need to use the cane in the dominant hand.  (Tr. 57).  The VE testified that this would eliminate the packer job, but that the other two jobs would remain.  (*Id.*).  The VE testified that if the hypothetical individual were off task more than 20 percent of the day, needed to recline for at least half the work day, or had bilateral upper extremity difficulties limiting use of the hand, this would preclude competitive employment.  (Tr. 57-58).  In addition, significant impairment in the ability to handle workplace stress would also eliminate competitive employment.  (Tr. 58-59).

## C.    Framework for Disability Determinations

Under the Act, DIB and SSI are available only for those who have a "disability."  *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007).  The Act defines "disability" in relevant part as the

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).

The Commissioner's regulations provide that a disability is to be determined through the application of a five-step sequential analysis:

Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

Step Two:  If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.

Step Three:  If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.

Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

Step Five:  Even if claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

*Schueneman v. Comm'r of Soc. Sec.*, No. 11-10593, 2011 U.S. Dist. LEXIS 150240 at *21 (E.D. Mich. Dec. 6, 2011) *citing* 20 C.F.R. §§ 404.1520, 416.920; *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001).  "The burden of proof is on the claimant throughout the first four steps . . . .  If the analysis reaches the fifth step without a finding that claimant is not disabled, the burden transfers to the [defendant]."  *Preslar v. Sec'y of Health & Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

**D.      The ALJ's Findings**

Following the five-step sequential analysis, the ALJ found Stewart not disabled.  At Step One he found that Stewart had not engaged in substantial gainful activity since his alleged onset date.  (Tr. 20).  At Step Two he assessed the following severe impairments:  "obesity, history of pulmonary embolism, thoracic compression fracture of an unspecified date, lumbar and thoracic spondylosis, chronic low back pain, history of heart catheterization, recurrent major depressive disorder, moderate, and generalized anxiety disorder."  (*Id.*).  At Step Three the ALJ found that

22

none of Stewart's impairments, either alone or in combination, met or medically equaled a listed impairment, specifically considering them against Listings 1.00, 4.00 and 12.00, but also noting that they did not meet the criteria for any other listing either.  (Tr. 21).  In making this finding, the ALJ concluded that Stewart had mild difficulties in his activities of daily living and social functioning, moderate difficulties in maintaining concentration, persistence and pace, and no episodes of decompensation of extended duration.  (*Id.*).

Next the ALJ assessed Stewart's RFC, finding him capable of performing

> sedentary work . . . except that the claimant can lift or carry 10 pounds frequently and 10 pounds occasionally (from very little, up to 1/3 o[f] an 8-hour workday); the claimant requires a sit/stand option at the workstation while remaining at the workstation (option means that the individual can sit/stand at will while performing their assigned duties); the claimant can stand and/or walk (with normal breaks) for a total of 2 hours in an 8-hour workday; the claimant can sit (with normal breaks) for a total of 6 hours in an 8-hour workday; can perform pushing and pulling motions with the upper and lower extremities within the aforementioned weight restrictions; limited to occupations that can be performed with one upper extremity for use of a cane for ambulation in the dominant hand; limited to occasional postural maneuvers such as balancing, stooping, kneeling, crouching, and climbing ramps, stairs, ladders, ropes and scaffolds; must avoid concentrated exposure to unprotected heights, moving machinery, and vibrating tools; limited to simple tasks with skill level not exceeding 1 or 2 step tasks.

(Tr. 22).  At Step Four the ALJ found that based on this RFC, Stewart could not return to his past relevant work.  (Tr. 27).  At Step Five, the ALJ concluded that, considering Stewart's age, education, vocational background and RFC, and with the assistance of VE testimony, there were a significant number of other jobs in the national economy that Stewart could still perform.  (Tr. 27-28).  Therefore, he was not disabled.  (Tr. 28).

### E.    Standard of Review

The District Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g).  Judicial review under this statute is limited in that the

Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal citations omitted); *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 654 (6th Cir. 2009) ("[I]f an agency has failed to adhere to its own procedures, we will not remand for further administrative proceedings unless the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses.") (internal quotations omitted).  Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotations omitted).  In deciding whether substantial evidence supports the ALJ's decision, the Court does "not try the case *de novo*, resolve conflicts in evidence or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.").

When reviewing the Commissioner's factual findings for substantial evidence, the Court is limited to an examination of the record and must consider the record as a whole.  *Bass*, 499 F.3d at 512-13; *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). The court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council," or in this case, the ALJ.  *Heston*, 245 F.3d at 535; *Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989).  There is no requirement, however, that either the ALJ or this Court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. Appx. 496, 508 (6th Cir. 2006) ("[A]n ALJ can

24

consider all evidence without directly addressing in his written decision every piece of evidence submitted by a party.") (internal quotations omitted). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted).

### F.     Analysis

Stewart alleges that the ALJ erred in a number of respects. He first argues that the ALJ erred by not giving his treating physician Dr. Gupta's opinion controlling weight and by not properly addressing the weight he ultimately gave the opinion. He further argues that the ALJ failed to properly analyze the effects of Stewart's obesity on his conditions and ability to work. Third, he argues that the ALJ erred in finding less than credible Stewart's subjective allegations of pain and disability. Finally, he argues that the ALJ failed to present a proper hypothetical to the VE, not only by omitting limitations based on pain and obesity but also because his evaluation of Stewart's mental impairment was not supported by substantial evidence of record. The Court takes each argument in turn.

#### 1.     *Dr. Gupta's Opinion*

Stewart first argues that the ALJ failed to give good reasons for not assigning controlling weight to Dr. Gupta's opinion that Stewart could not work due to back pain. He further argues that the ALJ erred in not specifying how much weight he actually assigned to the opinion.

An ALJ must give a treating physician's opinion controlling weight where it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and is "not inconsistent with the other substantial evidence in the case record." *Wilson v. Comm'r of Soc.*

*Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) *quoting* 20 C.F.R. § 404.1527(d)(2). If an ALJ declines to give a treating physician's opinion controlling weight, she must then determine how much weight to give the opinion, "by considering a number of factors, including the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and any specialization of the treating physician." *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) *citing Wilson*, 378 F.3d at 544; *see also* 20 C.F.R. § 404.1527(d)(2). The ALJ must give good reasons, supported by substantial evidence in the record, for the ultimate weight given to a treating source opinion. *Id.*, *citing Soc. Sec. Rul.* 96-2p, 1996 SSR LEXIS 9 at *12, 1996 WL 374188 at *5. An ALJ is not required to give any special weight to a treating source's conclusion that a claimant is disabled, as this conclusion is reserved to the Commissioner alone, based on all the evidence of record. 20 C.F. R. § 404.1527(e)(1), (e)(3).

Stewart argues that the ALJ erred by not giving Dr. Gupta's opinion controlling weight and by failing to articulate the weight he did give to that opinion. The Court disagrees. The ALJ gave good reasons for declining to give Dr. Gupta's opinion controlling weight, noting that his opinion was not based on actual examination of Stewart, finding that Dr. Gupta did not have a longitudinal treating record with Stewart, finding that Dr. Gupta relied "quite heavily" on Stewart's subjective reports, and that this was evidenced by the fact that the doctor's opinion "departs substantially from the rest of the evidence of record." (Tr. 26). While the ALJ did not specifically point to areas of inconsistency at this point in his opinion, he did identify them elsewhere in his decision. For example, the ALJ noted: that documentation from Stewart's early treatment history exhibits a lack of back pain complaints, despite his later allegations that he suffered his initial back injury in February 2010, (Tr. 23-24); that Stewart's report to Dr. Bray of

26

activities of daily living that was inconsistent with Dr. Gupta's opinion regarding his level of

function, (Tr. 25); and that treatment notes from Stewart's radiofrequency thermocoagulation

session on September 29, 2010, revealed no radicular symptoms or parasthesias, which was

contrary to his allegations of tingling in his hands and feet, (Tr. 23, 25).

The ALJ further declined to give weight to Dr. Gupta's ultimate opinion that Stewart

could not work due to chronic back pain, stating that he did not believe Dr. Gupta "was familiar

with the definition of 'disability' as contained in the Social Security Act," and stating that "it is

possible that the doctor was referring solely to an inability to perform the claimant's past work,"

which is a finding "consistent with the conclusions reached in this decision." (Tr. 26). *See also*

20 C.F. R. § 404.1527(e)(1), (e)(3). The ALJ also noted that Dr. Gupta's RFC ostensibly found

Stewart "capable of working at the sedentary exertional level," despite his opinion that Stewart

could not work. (Tr. 26).

Finally, despite these findings, the ALJ ultimately incorporated a number of Dr. Gupta's

limitations into his RFC, including standing no more than two hours and sitting no more than six

with a sit and stand option, limiting Stewart's postural movements (albeit not as much as Dr.

Gupta opined was necessary), and limiting Stewart to "simple tasks with skill level not

exceeding 1 or 2 step tasks," which takes into account Dr. Gupta's opinion that Stewart's pain

frequently interferes with his attention and concentration to simple work tasks. (Tr. 22; 525-27).

It is true that despite all of this analysis the ALJ failed to specifically articulate the actual weight

he ultimately gave to Dr. Gupta's opinion. However, the Court finds that his analysis as outlined

above "met the goal of § 1527(d)(2) – the provision of the procedural safeguard of reasons –

even though [he] has not complied with the terms of the regulation." *Friend v. Comm'r of Soc.*

*Sec.*, 375 Fed. Appx. 543, 551 (6th Cir. 2010). Here, the ALJ gave numerous good reasons for

refusing to give Dr. Gupta's opinion controlling weight, and, by incorporating a number of Dr. Gupta's limitations into his RFC, he allowed the Court to infer the level of weight he ultimately gave the opinion, despite not specifically articulating that weight.   Thus, contrary to Stewart's argument "the ALJ's opinion permits the claimant and a reviewing court a clear understanding of the reasons for the weight given a treating physician's opinion" thereby excusing "strict compliance with the rule." *Id.*.   The Court sees no error here warranting remand, and reiterates that an ALJ's decision is to be affirmed if it is supported by substantial evidence "even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Cutlip*, 25 F.3d at 286.

### 2.   *Obesity*

Stewart argues that the ALJ did not adequately account for his obesity because, while he found obesity to be a severe impairment, he allegedly did not incorporate limitations related to obesity into his RFC or into his hypothetical questions to the VE.   Stewart also argues that the ALJ erred by not specifically discussing the effects of his obesity on his other conditions.   Finally, Stewart further argues that the ALJ failed to use the physicians' RFCs that "explicitly considered" his obesity.   (Plf. Brf. At 14).   The Court disagrees that the ALJ erred in any of these respects.

The ALJ found Stewart's obesity to be a severe impairment.   (Tr. 20).   Although the ALJ did not make any additional mention of Stewart's weight in the remainder of his opinion, this is not necessarily fatal to his ultimate decision.   While the regulations require an ALJ to consider obesity, "[i]t is a mischaracterization to suggest that Social Security Ruling 02-01p offers any particular procedural mode of analysis for obese disability claimants." *Bledsoe v. Barnhart*, 165 Fed. Appx. 408, 412 (6th Cir. 2006).   Here, the ALJ's  RFC specifically found that Stewart could

only stand for a total of two hours a day, required a sit-stand option, and could only occasionally balance, stoop, kneel, crouch, and climb.  "These postural and exertional limitations directly address the problems in mobility typically associated with obesity."  *Moody v. Comm'r of Soc. Sec.*, No. 10-11684, 2011 U.S. Dist. LEXIS 97053, *28 (E.D. Mich. July 15, 2011) *adopted by* 2011 U.S. Dist. LEXIS 97087 (E.D. Mich. Aug. 30, 2011).

Furthermore Stewart's argument that the ALJ should have used RFCs from physicians who explicitly considered his obesity falls flat as the only physician to render an RFC in this case, Dr. Gupta, never mentioned in his opinion Stewart's obesity or imposed any specific limitations on him related directly to it, instead making those determinations based on his underlying conditions and functional abilities.  *See Essary v. Comm'r of Soc. Sec.*, 114 Fed. Appx. 662, 667 (6th Cir. 2004) (citing *Forte v. Barnhart*, 377 F.3d 892, 896 (8th Cir. 2004) (rejecting plaintiff's "argument that the ALJ erred in failing to consider his obesity in assessing his RFC," explaining that, "[a]lthough his treating doctors noted that [plaintiff] was obese and should lose weight, none of them suggested his obesity imposed any additional work-related limitations, and he did not testify that his obesity imposed additional restrictions")).  Stewart presented no other evidence of functional limitations stemming specifically from his obesity, and thus the Court finds no error in the way the ALJ's opinion evaluated its effects.  *See Essary* 144 Fed. Appx. at 667 (holding that ALJ's failure to elaborate on issue of obesity beyond finding it a severe condition stemmed from fact that plaintiff "failed to present evidence of any functional limitations resulting specifically from her obesity.").[1]

---

[1] In a separate section of his brief regarding the adequacy of the ALJ's hypothetical question, Stewart argues in passing that the ALJ failed to discuss his obesity at Step Three.  (Plf. Brf. At 19).  However, he fails to properly develop this argument beyond one clause of a sentence, and thus the Court deems it waived.  *See Martinez v. Comm'r of Soc. Sec.* No. 09-13700, 2011 U.S. Dist. LEXIS 34436 at *7 (E.D. Mich. Mar. 2, 2011) *adopted by* 2011 U.S. Dist. LEXIS 34421

3.     *Credibility*

Stewart next argues that the ALJ erred in assessing his credibility.  The Sixth Circuit has held that an ALJ is in the best position to observe a witness's demeanor and to make an appropriate evaluation as to his credibility.  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997).   Thus an ALJ's credibility determination will not be disturbed "absent compelling reason."  *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001).  When a complaint of pain is in issue, after the ALJ finds a medical condition that could reasonably be expected to produce the claimant's alleged symptoms, she must consider "the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians . . . and any other relevant evidence in the case record." to determine if the claimant's claims regarding the level of her pain are credible.  *Soc. Sec. Rul.* 96-7, 1996 SSR LEXIS 4 at *3, 1996 WL 374186 (July 2, 1996); *see also* 20 C.F.R. § 404.1529.

Stewart argues that the ALJ erred in finding him less than credible based on a failure to seek treatment and follow his doctor's advice, alleging that such conclusions are unsupported by substantial evidence of record.  In his decision, the ALJ found that Stewart was discharged from his physical therapy program due to a lack of progress, and noted that he "failed to comply with his home exercise program."  (Tr. 24).  Stewart argues that the therapy records do not support this conclusion.   The Court disagrees.   A full reading of the therapist discharge report demonstrates that while Stewart reported he was doing his exercises, but not consistently, the therapist questioned his compliance with home exercise program due to his lack of progress.

---

(E.D. Mich. Mar. 30, 2011) (noting that "[a] court is under no obligation to scour the record for errors not identified by a claimant" and "arguments not raised and supported in more than a perfunctory manner may be deemed waived") (citations omitted).

(Tr. 431-32).  The ALJ did not err in his reliance on this evidence.

Stewart argues that the ALJ failed to consider the effectiveness of pain management and his need to lie down to manage pain.  However, while Stewart informed Dr. Gupta in November 2010 (when he visited to complete disability reports) that he had not received much relief from his injections, a treatment note from August of that year noted that Stewart felt he received "pretty good" pain relief from one epidural injection (Tr. 410; 420).  Interestingly, there were no treatment records from the pain clinic regarding the effectiveness of any of the modalities of pain relief prescribed (including injections, nerve blocks and thermocoagulation therapy).  Thus, the ALJ had very little evidence to consider on the matter.  He was not required to rely solely on Stewart's subjective reports regarding the pain medication effectiveness in his testimony and when seeking to have his disability forms completed, especially in light of the other evidence that tended to make his subjective reports less than fully credible.  With regard to Stewart's testimony that he needed to lie down, the ALJ's decision not to rely on that testimony is supported by substantial evidence of record where Dr. Gupta himself found no need for such a limitation.  (Tr. 526)[2]

Stewart argues that the ALJ erred in finding that Stewart's daily activities were inconsistent with his allegations of disability, alleging there was no evidence supporting the activities the ALJ found that Stewart could do.  This is incorrect.  The portion of the ALJ's opinion to which Stewart cites states:

> The claimant's activities of daily living were done independently, but slowly due to pain or mobility issues.  The claimant reported engaging in housekeeping, laundry, cooking simple meals, shopping, check cashing, and a history of providing child care.  The claimant drove a car, watched TV, took walks, read, visited with others and ran errands.  He played

---

[2] In the section of the medical source statement form asking "Does your patient need to take unscheduled breaks/rest periods during the day?", Dr. Gupta wrote "N/A."  (Tr. 526).

video games, made appointments, and called 911 in an emergency.

(Tr. 25).  While the ALJ does not cite a specific exhibit in this paragraph of his opinion, the paragraphs before and after are his discussion of Dr. Hugh Bray's consultative psychological examination of Stewart.  (*Id.*; Tr. 307-312).  A review of the record as outlined above shows that these reports were made in the context of that examination.  (Tr. 308).  Thus the ALJ did cite to specific evidence when discussing these reported activities of daily living.

Ultimately the ALJ found Stewart less than credible due in part to these reports, as well as due to the inconsistency between Stewart's allegations of disabling pain and the objective medical evidence as discussed throughout the opinion, and specifically the lack of "significant longitudinal treatment history to the contrary."  (Tr. 27).

Finally, Stewart argues that the ALJ erred in finding that he failed to seek examination and treatment where he not only treated with the pain clinic and received injections and other modalities, but also was prescribed a TENS unit and completed a course of physical therapy.  Even if Stewart were correct that the ALJ erred in relying on a lack of treatment to support his credibility determination, it is harmless where the ALJ gave a number of good reasons, supported by substantial evidence of record, for finding Stewart less than credible.  *See Ulman v. Comm'r of Soc. Sec.*¸693 F.3d 709, 714 (6th Cir. 2012) (holding that even if ALJ's adverse credibility finding is based partially on invalid reasons, harmless error analysis applies and the decision will be upheld as long as substantial evidence remains to support it).  The Court finds no clear error with the ALJ's overall assessment of Stewart's credibility on the present record and recommends it be affirmed.

### 4.    *Adequacy of Hypothetical*

Finally, Stewart argues that the ALJ failed to ask a proper hypothetical to the VE.  In

addition to arguing that the ALJ failed to include limitations based on Stewart's subjective allegations of pain and obesity (which the Court finds are adequately addressed by the above analyses), he also argues that the ALJ's hypothetical failed to properly account for his mental limitations.

An ALJ is entitled to rely upon the testimony of a VE in response to hypothetical questions to the extent those questions accurately portray the claimant's physical and mental impairments. *Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987). It should be noted, however, that an ALJ is only required to pose those hypothetical limitations that she finds credible. *Burbo v. Comm'r of Soc. Sec.*, No. 10-2016, 2011 U.S. App. LEXIS 26143 (6th Cir. Sept. 21, 2011) *citing Stanly v. Sec'y of Health & Human Servs.*, 39 F.3d 115, 118-19 (6th Cir. 1994).

Here, the ALJ found that Stewart had mild limitations in his activities of daily living and social functioning, and moderate difficulties in maintaining concentration, persistence and pace. (Tr. 21). He based his conclusions on Stewart's own subjective reports of his functional abilities, the mental RFC assessment rendered by Dr. Balunas, and other record evidence, and although the ALJ cited the incorrect exhibit (3E), contrary to Stewart's argument, his conclusions are supported by exhibits 3A and 7E and other portions of the record. (Tr. 24, 26-27[3]; 59-67; 182-88). In his RFC, the ALJ limited Stewart to "simple tasks with skill level not exceeding 1 or 2

---

[3] For instance, the ALJ noted that even in connection with his emergency room visits, Stewart "denied any suicidal or homicidal ideations…denied any specific plans…[and] chose not to be admitted to the mental health unit, claiming all he needed was an adjustment to his psychotropic medications." (Tr. 26-27). The ALJ also noted that on follow-up, Stewart "evidenced no psychosis," and was discharged home. (Tr. 27). With respect to the February 2011 incident, *supra* at 17, the ALJ noted that Stewart "stabilized quickly," "was allowed to treat with his personal physician without any admission for mental health observation," and was "not deemed a threat to himself or others." (*Id.*). Finally, the ALJ noted that Stewart's relatively low GAF scores were "out of proportion with [his daily activities], and the evaluator did not explain how the low GAF was assessed." (Tr. 25).

step tasks" based on these findings.  (Tr. 22).  Besides alleging that the ALJ erred in citing exhibit "3E" to support his mental findings, Stewart makes no argument that the ALJ's RFC limitation was deficient in its scope, nor does he take issue with Dr. Balunas' mental RFC assessment upon which the ALJ clearly relied.  (Tr. 21).  The Court finds that the RFC's limitations sufficiently account for Stewart's mental impairment as that impairment was reported by him and his physicians, and assessed by Dr. Balunas.  Therefore, the ALJ's hypothetical questions to the VE, which included that limitation, were adequate and he was entitled to rely on the testimony they elicited.  *Varley*, 820 F.2d at 779.

In sum, after a review of the entire record, the Court finds that substantial evidence supports the ALJ's conclusion that Stewart was not disabled, and recommends that the decision be affirmed.

## III.    CONCLUSION

For the foregoing reasons, the court **RECOMMENDS** that Stewart's  Motion for Summary Judgment **[14]** be **DENIED**, the Commissioner's Motion **[15]** be **GRANTED** and this case be **AFFIRMED**.

Dated: February 4, 2014                          s/David R. Grand
Ann Arbor, Michigan                              DAVID R. GRAND
                                                 United States Magistrate Judge


### NOTICE TO THE PARTIES REGARDING OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and Fed.R.Civ.P. 72(b)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of HHS*, 932 F.2d 505, 508 (6th Cir.1991); *United States v. Walters*,

638 F.2d 947, 949–50 (6th Cir.1981).  The filing of objections which raise some issues, but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation.  *Willis v. Secretary of HHS*, 931 F.2d 390, 401 (6th Cir.1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir.1987).  Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on February 4, 2014.

s/Felicia M. Moses
FELICIA M. MOSES
Case Manager
